UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| David O'Moore, | |
|     *Plaintiff*, | |
| v. | No. 25 CV 2192 |
| Electrical Contractors Association and Local Union 134, I.B.E.W. Joint Pension Trust of Chicago, | Judge Lindsay C. Jenkins |
|     *Defendant*. | |

MEMORANDUM OPINION AND ORDER

In February 2023, David O'Moore began receiving early retirement pension benefits that he earned through his work with a contractor signatory to a pension fund (the "Fund") sponsored by Local Union 134, International Brotherhood of Electrical Workers. In October 2024, however, the Fund learned that O'Moore had worked for a contractor signatory to a pension plan with another local union from January 2022 to September 2024. Because that local union had signed a reciprocity agreement with Local Union 134, O'Moore's work during that time resulted in contributions being made to the Fund on his behalf. On that basis, the Fund found that O'Moore had engaged in prohibited employment under the terms of the Local 134 pension plan and suspended his benefits retroactive to February 2023.

O'Moore, proceeding *pro se*, sued the Fund under ERISA challenging the suspension and denial of benefits as an unlawful interpretation of the pension plan. The Fund now files a motion for summary judgment, which the court grants.

I.  Background[1]

Defendant Electrical Contractors Association and Local Union 134, International Brotherhood of Electrical Workers Joint Pension Trust of Chicago (the

---

[1] Local Rule 56.1 lays out the rules governing summary judgment motions in this district. See N.D. Ill. Local R. 56.1. All parties, including *pro se* litigants, are bound by these rules. See *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). As required by Rule 56.2, the Fund served O'Moore with a "Notice to Unrepresented Litigant Opposing Summary Judgment." [Dkt. 29.] And despite Local Rule 56.1(e)(3)'s requirement that parties dispute facts by citing "specific evidentiary material," O'Moore's response to the Fund's statement of facts as well as his additional statement of facts contain no citations. So the court draws facts from the Fund's Rule 56.1 statement. Local R. 56.1(d)(2) ("The court may disregard any

1

"Fund") sponsors a multiemployer pension plan (the "Plan") governed by the Employee Retirement Income Security Act ("ERISA"), 29. U.S.C. § 1001 *et seq.* [Dkt. 28, ¶¶ 3, 4.][2] Electrical contractors bound by a collective bargaining agreement or other written agreement with Local Union 134 contribute to the Fund. [*Id.*, ¶ 5.] The Fund also receives contributions from other International Brotherhood of Electrical Workers ("I.B.E.W.") benefit funds pursuant to reciprocity agreements. [*Id.*] The Fund's Board of Trustees administers the Plan. [*Id.*, ¶ 6.]

Under the Plan, a participant is eligible for an "Early Pension" if he, among other things, ceases "Industry Employment." [Dkt. 24 at 20.] "Industry Employment" is defined as "any period of employment in which a Participant is engaged in Covered Employment, whether as an employee of an Employer, sole proprietor, owner-operator, partner, independent contractor, self-employed person or otherwise, within the trade and geographic jurisdiction of the Union." [*Id.* at 97.] "Union" refers to "Local Union 134, International Brotherhood of Electrical Workers." [*Id.* at 17.] And as relevant here, "Covered Employment" means "any period of work by an Employee for which an Employer is obligated to make contributions" to the Fund or to "another fund which transfers the contribution to the [Fund] pursuant to a reciprocity agreement." [*Id.* at 8.]

In December 2021, David O'Moore ceased working for a contractor who contributed to the Plan based on a collective bargaining agreement with Local Union 134. [Dkt. 28, ¶ 34.] He applied for an Early Pension pursuant to the Plan in January 2023 and indicated that he wished for his pension benefits to commence on February 1, 2023. [*Id.*, ¶¶ 35, 36.] O'Moore received his first pension payment of $3,447.59 (his payments for February and March 2023) on March 1, 2023. [*Id.*, ¶ 38.] He continued to receive pension payments until September 30, 2024, for a total of $35,746.43 before taxes. [*Id.*, ¶ 40.]

O'Moore hadn't ceased working altogether, though. From January 1, 2022 to September 30, 2024, he worked for a contractor bound to an agreement with I.B.E.W. Local Union 364. [*Id.*, ¶¶ 41–43.] Because the Fund has a reciprocity agreement with the Local Union 364 Fringe Benefit Funds, the contributions the contractor made on O'Moore's behalf to Local Union 364's fund were subsequently paid to the Fund. [*Id.*, ¶ 43.]

---

asserted fact that is not supported with such a citation."); Local R. 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."). Still, most, if not all, of the disputes between the parties involve questions of law, not fact. See *Wetzler v. Illinois CPA Soc. & Found. Ret. Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009) ("An issue as to whether a certain term as construed violates ERISA is a question of law.").

[2] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

2

In October 2024, the Fund sent a letter to O'Moore informing him that it was suspending his pension benefits retroactive to February 1, 2023 because his work for the Local Union 364 contractor constituted "Industry Employment." [Dkt. 24 at 141–42.] O'Moore appealed the decision to the Board of Trustees Claims Review Committee, which upheld the suspension. [*Id.* at 164.]

Under the terms of the Plan, the Fund has "discretion to construe the Plan terms and determine when Plan benefits will be paid" and has "complete authority to determine the standard of proof required in any case and to apply and interpret the Plan." [Dkt. 24 at 47, 49.] The Fund's decision, moreover, is "final and binding on all persons." [*Id.* at 57.]

O'Moore then filed this lawsuit bringing three counts against the Fund. The court previously granted the Fund's motion to dismiss Counts II and III. [Dkt. 23.] The only question for summary judgment, then, is whether O'Moore can prove that the Fund unlawfully suspended his benefits.

## II. Legal Standard

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Reed v. Brex, Inc.*, 8 F.4th 569, 578 (7th Cir. 2021) (quotation omitted). A party opposing summary judgment "must go beyond the pleadings ... to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in his favor." *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (cleaned up).

Because the Plan gives the Fund discretionary authority to determine eligibility for benefits and construe terms, O'Moore must show that the Fund's decision to suspend his benefits was arbitrary and capricious. See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Bator v. Dist. Council 4*, 972 F.3d 924, 929 (7th Cir. 2020). The court's review, moreover, is limited to the administrative record at the time of the benefits decision so the Fund cannot "augment the administrative record with new facts bearing upon the application for benefits." *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996). The Fund is not, however, "limited to repeating what [it] told the applicant" and "can defend [its] interpretation with any arguments that bear upon its rationality." *Id.* at 923.

O'Moore faces a high hurdle. "Under the arbitrary and capricious standard, an administrator's decision will not be overturned if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (cleaned up). Put simply, the

3

court grants the Fund "great deference" and will only reverse if its decision is "downright unreasonable." *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 828 (7th Cir. 2004). Whether the court would have decided the question differently is of no consequence. *Id.*

### III. Analysis

"In some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001). But unlike traditional contract law where ambiguous language cuts in favor of the non-drafting party, a court reviewing a plan administrator's decision with deference "must view the contractual ambiguity through a lens that gives broad discretion to the plan administrator to interpret the plan." *Dabertin*, 373 F.3d at 833; see also *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1011 (7th Cir. 1998) ("[A]lthough, generally, ambiguities in an insurance policy are construed in favor of an insured, in the ERISA context in which a plan administrator has been empowered to interpret the terms of the plan, this rule does not obtain."). So the court begins by determining whether the language at issue here is ambiguous.

O'Moore says no. Because the Plan defines "Industry Employment" as "any period of employment in which a Participant is engaged in Covered Employment … *within the trade and geographic jurisdiction of the Union*," and "Union" as "Local Union 134, International Brotherhood of Electrical Workers," he asserts that the work he performed within the jurisdiction of Local Union 364 cannot fall within the definition of "Industry Employment."

O'Moore's position has some purchase. At first glance, it's difficult to grasp how "within the [] geographic jurisdiction of [Local Union 134]" can also include work performed within the jurisdiction of Local Union 364. But pointing to the purpose and overall context of the Plan, the Fund urges the court to see ambiguity. See *Est. of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018) ("[T]he plan must be read as a whole, considering separate provisions in light of one another and in the context of the entire agreement.") (internal citations omitted).

The Fund's initial rationale is unconvincing. It avers that because the I.B.E.W. is a labor organization whose Constitution governs all members and subordinate bodies throughout the United States and Canada, any reference to the jurisdiction of the I.B.E.W. or of a particular local union refers to all of the United States and Canada. Not only does this reasoning rely on evidence outside the administrative

4

record (the I.B.E.W.'s Constitution),[3] but it also overlooks that the Plan specifically defined "Union" as Local Union 134, not the I.B.E.W. more broadly.

The Trustees, too, appear to recognize a distinction between the jurisdiction of the I.B.E.W. and that of local unions by describing O'Moore's most recent employment as within "the jurisdiction of IBEW Local Union 364." [Dkt. 24 at 140.] If the jurisdiction of each local union means nothing less than the jurisdiction of the entire I.B.E.W., then there would be no reason to specify the local union. See *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010) ("Contract interpretations should, to the extent possible, give effect to all language without rendering any term superfluous.").

But with the limits of deferential review in mind, the Fund's remaining arguments are more persuasive. Focusing its attention on the reciprocity agreement between Local Union 134 and Local Union 364, the Fund asserts that the Plan separates benefits coverage from physical location—treating a participant's work performed in locations beyond the geographical boundaries of Local Union 134 as within the trade and geographical jurisdiction of Local Union 134 for benefit purposes whenever the work results in contributions being made to the Plan on the participant's behalf.

Unpacking this argument requires a closer look at the Plan's use of reciprocity agreements. Recall that the Plan is an agreement between two parties, the Electrical Contractors Association and Local Union 134 I.B.E.W., that establishes a pension fund for employees in the construction industry within the jurisdiction of Local Union 134. [Dkt. 24 at 6.] Members of Local Union 134, however, may spend some time working for employers outside of that geographic area. To ensure that those employees do not lose credit toward their pension benefits, the Fund enters into reciprocity agreements with other funds. [*Id.* at 23.] Reciprocity agreements essentially treat the Local Union 134 member working outside the Union's jurisdiction as if he was working within the jurisdiction of the Union by transferring any contribution made to a different fund on behalf of the Local Union 134 member to the Fund. [*Id.* at 12, 23.]

That is exactly what happened with O'Moore. As a member of Local Union 134, O'Moore worked for a contractor located within the geographic jurisdiction of the Union until December 2021. During that time, the contractor made contributions directly to the Fund on O'Moore's behalf. In January 2022, however, O'Moore began working for a contractor located outside of the Union's geographic jurisdiction and instead within the geographic jurisdiction of Local Union 364. Despite his transfer to

---

[3] No doubt the Fund knows of the rule against citing evidence outside the administrative record as it spilled much ink drawing the court's attention to extrinsic evidence cited by O'Moore. [Dkt. 38 at 2 ("The Fund objects to the admission of any evidence outside the administrative record considered by the Trustees.").] As it must, the court relies only on evidence in the administrative record.

5

a location outside the geographical bounds of Local Union 134, contributions on O'Moore's behalf continued to be made to the Fund based on a reciprocity agreement between Local Union 134 and Local Union 364. O'Moore continued working for the Local Union 364 contractor until September 30, 2024.

Now remember that O'Moore began receiving his Early Pension benefits on February 1, 2023. That means he was receiving pension benefits from the Fund at the same time he was working a job that resulted in additional contributions being made to the Fund on his behalf. But ERISA plans often include a prohibition on certain types of employment for those collecting retirement benefits to prevent them from competing for jobs with active union-member plan participants. See *Cent. Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 742 n.1 (2004) ("Congress seems to have been motivated at least in part by a desire to protect participants against their pension plan being used, in effect, to subsidize low-wage employers who hire plan retirees to compete with, and undercut the wages and working conditions of employees covered by the plan." (internal citation omitted)); *Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 574 F.3d 644, 649 (8th Cir. 2009). Allowing O'Moore to do just that by collecting a salary from an employer contributing, albeit indirectly, to the Plan on his behalf would controvert that purpose.

And while the Plan certainly could have been more clear on the point, it is reasonable to read the text in a way that is consistent with that purpose. The definition of "Industry Employment" uses several defined terms that envision coverage for Union members who work outside the physical geographic bounds of the Union when those members work for an employer bound by a reciprocity agreement with the Union. "Covered Employment" includes work resulting in contributions directly to the Fund as well as those made pursuant to a reciprocity agreement. [Dkt. 24 at 8.] "Participant" means any employee, including those working outside the geographic boundaries of the Union, for which contributions have been made to the Plan. [*Id.* at 13.] "Employer" includes not only employers who execute agreements to contribute to the Fund but also any employer who is not a party to an agreement with Local 134 but contributes to a fund having a reciprocity agreement with the Fund. [*Id.* at 9.] Considering its inclusion of terms that specifically address reciprocity agreements, then, the Fund's reading of "Industry Employment" to include employees for whom contributions are made pursuant to reciprocity agreements does not seem downright unreasonable.

At bottom, when read as a whole and in light of its purpose, the Plan is sufficiently ambiguous as to whether a participant may receive early pension benefits when working for an employer that is located outside the geographic jurisdiction of the Union but, pursuant to a reciprocity agreement, makes payments on the Union member's behalf that result in contributions to the Fund. As the plan administrators, the Fund's "use of interpretative tools to disambiguate ambiguous language is … entitled to deferential consideration by a reviewing court." *Marrs v. Motorola, Inc.*, 577 F.3d 783, 786 (7th Cir. 2009) (emphasis omitted). So while O'Moore's reading of

"Industry Employment" *might* have come out on top if read in isolation, it would be a stretch to find that the Fund's contrary reading was arbitrary and capricious when read in context.

## IV. Conclusion

For these reasons, the Fund's motion for summary judgment is granted.

Enter: December 17, 2025
Date: 25-cv-2192

_____
Lindsay C. Jenkins

7